UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                              CASE NO. 3:13-cr-77-J-34JBT

KENNETH JACKSON

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on the Motion to Suppress Evidence ("Motion") (Doc. 19) and the United States's Response thereto ("Response") (Doc. 23). The Court held an evidentiary hearing on the Motion on May 30, 2013. (*See* Doc. 24.) For the reasons set forth herein, the undersigned recommends that the Motion be **DENIED**.

### I.  Issues Presented and Summary of Recommendation

In the Motion, Defendant seeks to suppress "all evidence seized from 681 NE St. Clair Street, Lake City, Florida, on May 24, 2012, including but not limited to firearms, ammunition, marijuana, paraphernalia, or other contraband," which was allegedly obtained in violation of the Fourth, Fifth, and Fourteenth Amendments to

---

[1] Within fourteen days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida. Failure to file a timely objection waives a party's right to review. Fed. R. Crim. P. 59.

1

the United States Constitution. (Doc. 19 at 1.) Defendant argues that the subject evidence should be suppressed because when the officers entered his house for the purpose of executing a warrant for his arrest, they did not have the necessary "reason to believe" that he was inside the residence. (*Id.* at 6-9.) The undersigned disagrees, and finds that the facts and circumstances available to the officers at the time of entry (approximately 11:20 a.m.), including the presence of Defendant's only vehicle (and no others) immediately outside the dwelling; the presence and position of one pair of shoes by a main door to the house; Defendant's prior drug sales at his residence and nearby at mid-day; the lack of any known employment of Defendant; and a noise inside the residence heard by one of the officers, satisfied the applicable reasonable belief standard that Defendant was inside the residence. Accordingly, the undersigned recommends that the Motion be denied.

## II.     Evidence at the Hearing

At the evidentiary hearing before the undersigned, the government presented the testimony of one witness, Corporal Jennifer Wolf ("Corporal Wolf") with the Columbia County Sheriff's Office. Both sides admitted various exhibits into evidence, including the Florida capias for Defendant's arrest (Gov't Ex. 1), the Florida information supporting the capias (Gov't Ex. 2), printouts regarding Defendant and Defendant's motorcycle/scooter from the Driver and Vehicle Information Database ("DAVID") for the State of Florida (Gov't Exs. 3, 5), the subsequently obtained search warrant (and supporting affidavit) for Defendant's

residence (Gov't Ex. 6), and several photographs of the exterior of Defendant's residence and adjacent areas (Gov't Exs. 4A–4E; Def. Exs. 1, 3).

### A.     Corporal Wolf's Testimony

Corporal Wolf was one of the officers involved in the effort to arrest Defendant on May 24, 2012, at his residence located at 681 NE St. Clair Street, Lake City, Florida.  (Tr. 13-14, 17.)  The other officers were Deputy Winston Warner and Deputy Robert Sands.[2]  (Tr. 17.)

Corporal Wolf first testified that she had been employed with the Columbia County Sheriff's Office for almost nine years – first, as a deputy sheriff on patrol, then, as a detective on the multi-jurisdictional task force, and, presently, as a corporal on patrol. (Tr. 6-7.)  She next testified that prior to May 24, 2012, she was aware of Defendant's prior narcotics sales through a confidential source, other intelligence, and information from the Lake City Police Department.  (Tr. 7-10, 32-33.)  In her investigation of Defendant, she had not learned of him having any employment.  (Tr. 27-28.)

Corporal Wolf testified about three known drug sales involving Defendant as a seller and a confidential source as a buyer of small amounts of marijuana.  (Tr. 8-10.)  The first encounter occurred on May 10, 2011, at 1:50 p.m., just outside Defendant's residence at 681 NE St. Clair Street.  (Tr. 8.)  The second encounter

---

[2] These officers were later joined by Deputy Josh Joyner who brought a door tool (*i.e.*, a ram) to gain entry to the residence.  (Tr. 17.)

occurred on May 12, 2011, at 2:00 p.m., also at 681 NE St. Clair Street. (Tr. 9.) The third encounter occurred on May 16, 2011, at 2:39 p.m., on Fronie Street, which is approximately three or four blocks from 681 NE St. Clair Street. (Tr. 9-10.) The May 10 and May 16 sales were charged in the information. (Tr. 12; Gov't Ex. 2.)

Corporal Wolf further testified that based on prior intelligence and her own observations, she was aware that Defendant drove a small motorcycle/scooter (Yamaha), which was the only vehicle listed under his name on DAVID. (Tr. 10-11, 15-17; Gov't Exs. 3, 5.) She had not seen Defendant drive any other vehicles. (Tr. 11.)

With respect to the events on May 24, 2012, Corporal Wolf testified that she and Deputies Warner and Sands arrived at 681 NE St. Clair Street, which was listed as Defendant's residence on DAVID and was where two of three prior drug sales had taken place,[3] at or around 11:20 a.m. (Tr. 14-15; Gov't Exs. 3, 5.) It was "a small wood-frame residence, white in color, single family, single story." (Tr. 17; *see also* Gov't Exs. 4A, 4E; Def. Exs. 1, 3.) The only vehicle in the area was Defendant's motorcycle, which was parked "very close" to the residence (within 30 feet at most). (Tr. 18, 30; Gov't Exs. 4C, 4D.) There was a worn path from the area where the motorcycle was parked to what appeared to be the main entrance to the house. (Tr. 31.)

---

[3] Corporal Wolf testified: "[O]ur intelligence said that's where [Defendant] resided as well." (Tr. 14.) Defendant does not contest that this house was his residence. (*See* Tr. 48.)

4

Upon arrival, Corporal Wolf took a position on the northeast corner of the residence (Tr. 18), Deputy Sands – on the north side of the residence (Tr. 38-39), and Deputy Warner knocked on the primary entranceway door, but nobody answered (Tr. 18, 21, 29-30; *see also* Gov't Ex. 4A). Corporal Wolf observed "a pair of shoes that's on a rug there at the door as if someone had taken them off before they had gone in." (Tr. 19; Gov't Ex. 4B.)

Corporal Wolf also testified that she was not able to see inside the residence at any point of time, but she "did hear a thunk or thud noise" and immediately notified Deputy Warner of the noise by radio to see if he had made entry and because of her concern that there might be someone inside. (Tr. 22; 40 ("I believed at the time that [Deputy Warner] had made entry into the house and that was the noise I heard, but he had said that it was not.").) She testified that she heard that noise only once. (Tr. 28.) She explained:

> The best way I can describe it is like a thud or a clunk, like maybe some sort of movement inside. I don't know. As I listed in my report, there were several window air-conditioner units. I don't know if it was from one of them shutting off or turning on. I don't know what that noise was. I was unable to determine . . . exactly what it was.

(*Id.*)

After Deputy Warner responded to Corporal Wolf's radio call that he was not inside the residence, the three officers unsuccessfully attempted to enter the house. (Tr. 23.) Realizing that they would need equipment to open the door, they called Deputy Joyner, who was nearby, to bring a door tool. (Tr. 23, 40-41.) He arrived

5

within approximately ten minutes, and entry was made at that point. (Tr. 23-24.) The officers attempted to locate Defendant inside the residence by looking in "[b]athrooms, under beds, in closets, anywhere a person could hide." (Tr. 24.) During this search, Deputy Joyner located a firearm under the foot of the bed in the master bedroom. (Tr. 24, 46.) Corporal Wolf detected an "overwhelming odor of green marijuana coming from that same room." (Tr. 24.) Taking the firearm with them, the officers exited the residence. (Tr. 25.) While outside, they ran the serial number of the firearm on their database and found out that it was stolen. (*Id.*) Corporal Wolf departed to obtain a search warrant for the residence while the other Deputies maintained the security of the residence. (*Id.*)

Upon obtaining and executing the search warrant, the officers found another firearm and marijuana in the same bedroom where the first firearm had been located earlier. (Tr. 26-27.) After executing the search warrant, Corporal Wolf wrote in her report that the noise she heard prior to entry came from one of the air-conditioning units in the residence. (Tr. 28.) Defendant was not located inside the residence, or elsewhere, on that day. (Tr. 25, 28-29.)

On cross-examination, Corporal Wolf testified as to her exact location near an air-conditioning unit when she was outside the house and she heard the noise. (Tr. 43.) In regards to the noise, she testified she "believed it was movement inside the residence" and "it was enough for [her] to notify Deputy Warner of that noise" because she "believed at the time that he had made entry into the house and that

6

was the noise [she] heard, but he had said that it was not." (Tr. 39-40.) The following testimony followed:

> Q. And when you said that you weren't able to determine what it was, you wrote in your report that you determined that to be the air conditioner, correct?
> A. Yeah. As we made entry into the house and executed the search warrant -- at the time I believed that Mr. Jackson was in the residence. It was my belief, from what I heard, that he was in there.
>    Of course, after we discover he's not, I'm trying to investigate what the noise was that I heard. Obviously it's enough for me to notify Deputy Warner, because I wanted him to know what I heard. In the event someone is in the house, I want to make sure he's safe.
> . . .
> Q. But that movement is what you're describing as the thunk or the thud noise that you heard, correct?
> A. Correct.
> Q. Okay. A thud to me is like something falling, you know, like something falls off the shelf and hits the floor.
>    Are you describing a noise like that?
> A. Correct, but if there's no one in the house, there shouldn't be a noise like that coming from inside.
> Q. But you determined that in fact that noise was the air-conditioning unit, correct?
> A. Yes, ma'am, but --
> Q. And you were standing --
> A. -- that's the only thing that I could see in the residence that would make a noise that I may have heard. Honestly to this day I don't know what it could have been.
> Q. All right. Well, two questions to follow up on that.
>    The first is, you were standing right next to the air-conditioning unit, correct?
> A. There was multiple in the house.
> Q. You were standing next to one of the air-conditioning units, correct?
> A. Yes, ma'am.
> Q. And then you wrote very definitively in your report that the noise you heard was the air-conditioning unit, correct?
> A. Correct.
> . . .

> Q. So other than one single noise, there's no other information that there's a person inside.
> A. No.
> Q. You didn't have any information; is that correct?
> A. Based on the scooter being there, the shoes in position at the door, what I heard, I believed there was someone in that residence at that point.

(Tr. 41-44.)

In regards to the shoes, on cross-examination, Corporal Wolf testified:

> I took photos of these shoes at this time because to me how they're positioned is not something I'd normally seen. It was enough for me to take a picture of it, and we have it today because I believed that they took them off to go into the house. There's not numerous shoes. It's one pair. At the time it was very important to me.

(Tr. 45-46; *see also* Gov't Ex. 4B.)

Defendant concluded the cross-examination with the following questioning:

> Q. When you were looking at the intelligence and background, did you also determine that Mr. Jackson was serving weekends at jail, at the Columbia County Sheriff's Office?
> A. No.
> Q. Would that be publicly available information to you if you looked at the court docket?
> A. Yes.
> Q. Would there be a Columbia County record of jail records and who's in jail and when they're there?
> A. Yes.

(Tr. 46-47.)

### B. Credibility Finding

The undersigned accepts Corporal Wolf's testimony as credible, and adopts and incorporates the same as the undersigned's findings of fact. The undersigned

notes that on cross-examination Corporal Wolf admitted to making a prior inconsistent statement in her report regarding the cause of the noise heard just prior to entry on May 24, 2012.  However, even considering this inconsistency, the undersigned finds the totality of her testimony credible, including the part that "to this day" she does not know the cause of the noise.  (Tr. 43.)

### III.   Standard

The standard for entry into a residence based on an arrest warrant was set forth in *Payton v. New York*, where the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  445 U.S. 573, 603 (1980). "*Payton* thus requires a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995).

In *Magluta*, the Eleventh Circuit elaborated:

> Due to the lack of authority on point, it is difficult to define the *Payton* "reason to believe" standard, or to compare the quantum of proof the standard requires with the proof that probable cause requires. We think it sufficient to hold that in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant *a reasonable belief* that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of

> entry. . . . In evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence. For example, officers may take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home, and officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule.

*Id.* at 1535 (emphasis added).

### IV.     Analysis

Defendant does not contest that the first prong of the two-part *Payton* inquiry is met, namely, that the officers had a reasonable belief that the residence searched on May 24, 2012 was Defendant's dwelling. (Tr. 48.) Therefore, the only issue before the Court is whether, at the time of entering the residence on May 24, 2012, the officers had "a reasonable belief" that Defendant was within that residence. The undersigned recommends that the facts and circumstances known by the officers at the time of entry, viewed in their totality, warranted a reasonable belief that Defendant was inside the residence. In reaching this conclusion, the undersigned has considered multiple "common sense factors" indicating Defendant's presence, which clearly support the officers' "on the spot determination" to enter the residence. *Magluta*, 44 F.3d at 1535.

The first such factor is the presence of Defendant's motorcycle, which was his only vehicle, at the residence. *See Magluta*, 44 F.3d at 1538 ("The presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect

is at home."); *see also United States v. Zavala*, 408 F. App'x 319, 322 (11th Cir. Jan. 18, 2011) (per curiam); *United States v. Bridgewater*, 333 F. App'x 470, 472 (11th Cir. June 24, 2009) (per curiam); *United States v. Bervaldi*, 226 F.3d 1256, 1267 (11th Cir. 2000); *United States v. Beck*, 729 F.2d 1329, 1331 (11th Cir. 1984) (per curiam). Further, there were no other vehicles parked in the area (*see* Tr. 18, 30), indicating the presence of no one else inside the dwelling. Although this factor is not conclusive, it is a common sense indicator of Defendant's presence.

The second important common sense factor indicative of Defendant's presence is the shoes by the front door, which were present and positioned as if someone had just taken them off to enter the dwelling. (*See* Tr. 30, 45-46; Gov't Ex. 4B.) The next factor is the noise heard by Corporal Wolf while she was standing at the northeast corner of the residence. Corporal Wolf testified: "It was my belief, from what I heard, that he was in there." (Tr. 41.) She described the noise as a thud (*e.g.*, "like something falling"), and on cross-examination explained that "if there's no one in the house, there shouldn't be a noise like that coming from inside." (Tr. 42.)

Another common sense factor is Defendant's lack of known employment and his prior drug sales at or near his residence in the early afternoon. Although reasonable officers might not expect a working person to be home in the late morning, it was reasonable for the officers not to make this assumption regarding Defendant, even given the remoteness in time of the prior drug sales. Thus, although the time of day did not warrant an inference that Defendant was home, it

did not warrant an inference that he was not home either.

In short, the totality of the circumstances clearly supported a reasonable belief that Defendant was inside the residence. There is no indication from the Eleventh Circuit that greater proof is needed. In fact, it appears entry has been upheld in circumstances of equal or lesser proof than present here. *See, e.g.*, *Beck*, 729 F.2d at 1331-32 (presence of defendant's car and 7:30 a.m. time of entry); *Zavala*, 408 F. App'x at 322 ("presence of the suspect's car, the early hour, and the absence of the suspect at his other suspected residence"); *Bridgewater*, 333 F. App'x at 472 (presence of a car Defendant was seen driving a week earlier and 7:00 a.m. time of entry). The only basis to distinguish the foregoing cases in Defendant's favor is that they all involved early morning entry. However, for the reasons previously discussed, although this factor did not weigh in favor of a reasonable belief of Defendant's presence, it did not weigh against it either. Although it is difficult to compare the totality of facts in each of the above cases with this case, it appears that the added factors of the shoes and the noise provide stronger "reasonable belief" in this case than in any of the foregoing cases.

In the face of the totality of the above factors, Defendant seeks to attack each one individually and argue that each such factor is not determinative. (*See* Doc. 19 at 6 (stating that the presence of the scooter "alone is not reason to believe that Mr. Jackson was actually inside the residence").) However, this argument misses the point. No single factor need be determinative. In fact, even all the factors together

need not be absolutely determinative of a suspect's presence. Rather, they must only support a "reasonable belief" of his presence inside the residence.

In particular, Defendant argues that the noise heard by Corporal Wolf did not justify entry. Again, the noise was only one of several factors indicating Defendant's presence in the residence. Nevertheless, the undersigned accepts Corporal Wolf's testimony that the noise she heard was so indicative of movement in the house that she actually radioed Deputy Warner to make him aware of the noise and to see if he had entered. The undersigned rejects Defendant's invitation to dissect the noise and conclude that "[t]rained law enforcement officers would not mistake an air conditioner for human movement." (Doc. 19 at 7-8.) Corporal Wolf credibly testified that she still does not know exactly what caused the noise. The undersigned concludes that the noise was a legitimate common sense factor justifying entry.

Defendant further argues that the officers did not have a reasonable belief that he was inside the residence given that the noise occurred only once over a period of more than ten minutes. (Tr. 48.) A similar argument was rejected by the court in *Bridgewater* and it is also rejected here:

> [J]ust because [the officer] observed no movement within the house after he knocked or while he waited for backup officers to arrive did not mean that the officers could not reasonably believe that Bridgewater was inside. The officers could reasonably expect Bridgewater to hide inside if he could. Therefore, the district court did not clearly err by finding that, at the time of entry, the officers reasonably believed that Bridgewater was inside the house or by denying his motion to suppress.

*Bridgewater*, 333 F. App'x at 472 (internal citations omitted); *see also Magluta*, 44

F.3d at 1535 ("[A]s to the second *Payton* prong, . . . officers may take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home[.]"). Moreover, as in *Bridgewater*, there were other factors supporting the officers' reasonable belief that Defendant was inside the residence.

Finally, the undersigned notes that Defendant does not argue that the officers had an obligation to execute the capias somewhere other than his home, although that appears to be the implication of the questioning of Corporal Wolf regarding Defendant allegedly serving weekends in jail during this time period. (*See* Tr. 46-47.) However, even assuming this argument was made explicitly, the undersigned would reject it. First, no evidence was presented that Defendant was in fact serving weekends at the jail during this time frame. Second, Defendant has not cited any case law, and the undersigned is aware of none, which indicates that the officers had any obligation to search court or other records to determine such a fact or to attempt to serve the warrant in that manner.[4]

Therefore, based on the foregoing, the officers had a reasonable belief that Defendant was inside the residence at the time of entry.[5] As stated by the Eleventh

---

[4] The officers attempted to execute the arrest warrant on May 24, 2012, which was a Thursday.

[5] Defendant argues that reasonable belief equates to probable cause and invites this Court to so hold. (Doc. 19 at 6.) However, the Eleventh Circuit itself has explicitly declined to do so. *Magluta*, 44 F.3d at 1535. There is no reason for the Court to do so
(continued...)

14

Circuit, "[n]either *Payton* nor this court's Fourth Amendment jurisprudence requires law enforcement officers to be absolutely certain that a suspect is at home before entering a residence to execute an arrest warrant." *Magluta*, 44 F.3d at 1538. Although the subsequent search of the dwelling revealed that Defendant was not in fact there, the reasonableness of the officers' actions must be judged based only on "the facts and circumstances within the knowledge of the law enforcement agents" at the time of entry. *Id.* at 1535. Because the officers here had "valid justification to enter the residence[,] they were entitled . . . to engage in a protective sweep of the premises. Any evidence discovered in plain view during the sweep was properly used to secure a search warrant for the premises." *Id.* at 1538.

### RECOMMENDATION

Accordingly, it is respectfully recommended that the Motion (**Doc. 19**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on June 12, 2013.

_____
JOEL B. TOOMEY
United States Magistrate Judge

---

⁵(...continued)
here either since the facts and circumstances clearly satisfy the reasonable belief standard.

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record